784 A.2d 641

**Zi Qiang CHEN,**

v.

**STATE of Maryland.**

No. 2710, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Nov. 5, 2001.

Nancy S. Forster, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief,) Baltimore, for appellant.

Gary E. Bair, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General,) Baltimore and (Logan C. Widdowson, State's Attorney for Somerset County, Princess Anne, on the brief) for appellee.

Argued before DAVIS, KRAUSER, and WILLIAM W. WENNER, (retired, specially assigned) JJ.

KRAUSER, Judge.

The Circuit Court for Somerset County convicted appellant, Zi Qiang Chen, of possessing and transporting unstamped cigarettes in violation of Md.Code Ann. (1988, 1997 Repl.Vol., 2000 Supp.), §§ 12–305 and 13–1015 of the Tax–General Article ("T.G."). It then fined him $3,595, whereupon he noted this appeal.

Mr. Chen now urges this Court to reverse his convictions, claiming that T.G. § 12–305 is "of no force and effect" because it does not contain a penalty, and that the evidence does not support his conviction under T.G. § 13–1015. The former claim is self-explanatory but the latter requires explanation.

Section 13–1015, as appellant notes, proscribes willfully transporting unstamped cigarettes. Therefore, according to

appellant, the State had the burden of proving not only that he intentionally transported the cigarettes in question but that he did so, knowing it to be a violation of the law. That burden, appellant asserts, the State failed to bear.

■ Because we find no merit to either claim, we shall hold that the absence of a penalty in T.G. § 12–305 does not render that statutory provision a nullity and that the term "willful[ ]" in the context of T.G. § 13–1015 denotes only an intentional and deliberate violation of that provision and does not require that the State prove that appellant knew that what he was doing was illegal. In other words, we decline appellant's invitation to carve out another exception to the common law rule that "ignorance of the law is no excuse" and that every citizen is presumed to know the law.

## BACKGROUND

Before trial, appellant presented a motion to dismiss and a motion to suppress the evidence. After a hearing, both motions were denied, and this matter proceeded to trial on a statement of the facts presented by the State and agreed to by appellant. The following is a summary of that statement:

On July 11, 2000, agents of the Field Enforcement Division of the Comptroller of the Treasury conducted a surveillance of the Peace Token store in New Church, Virginia, as part of an effort to stem the importation of large quantities of unstamped cigarettes into the State of Maryland. At approximately 4:05 p.m. that day, Agent Kane, one of the surveilling officers, observed a white caravan with North Carolina license plates parked under a wooden canopy, at the rear of the store. According to Agent Kane, this was "a common practice used by individuals when they are picking up large quantities of cigarettes from this establishment and transporting them into the State of Maryland," because a vehicle parked at that location is not visible from the highway.

At approximately 4:25 p.m., Agent Kane observed appellant open the passenger side door of the caravan and "proceed[ ] to move a few items around the passenger's compartment of the

vehicle." After closing and locking the passenger side door of the caravan, appellant went to the rear of the vehicle where he opened the tailgate and removed several large trash bags. He then entered the rear of the store.

At approximately 4:35 p.m., Agent Kane observed appellant leave the rear of the store and reopen the tailgate of the caravan. Upon entering the rear of the vehicle, he began rearranging items inside. Moments later, he left the vehicle and returned to the rear of the store. There, he picked up a large black trash bag containing approximately two large rectangular objects. "Knowing this is a common method to transport cigarettes," Agent Kane believed the items in the large black trash bag to be "cases of cigarettes."

At approximately 4:41 p.m., appellant placed the trash bag into the caravan. After climbing into the driver's seat of the vehicle, he drove away from the Peace Token store, heading north. The agents followed.

Twenty minutes later, appellant was observed by the agents pulling into a Royal Farm store. At approximately 5:20 p.m., appellant left the Royal Farm store with a hand cart containing four boxes, which the agents believed, from the markings on the boxes, to be cases of cigarettes. After taking the boxes to the rear of the caravan, appellant placed them in trash bags. He covered the trash bags with a blanket and then drove across the street to "Dixieland," an Exxon gas station and "also a discount cigarette establishment." Several minutes later, appellant left Dixieland and drove north on Route 13.

The agents followed appellant as he crossed the Virginia state line into Maryland. At approximately 5:45 p.m., they stopped his vehicle in Somerset County, Maryland.

After identifying himself, Agent Kane explained to appellant that he believed that appellant was transporting cigarettes into Maryland. He asked appellant "if he had cigarettes in his vehicle." Appellant replied, "yes, I have cigarettes." But when asked if he had any paperwork permitting him to

transport the cigarettes, appellant stated, "I speak little English but I have cigarettes."

Agent Kane asked appellant to get out of his vehicle. Standing at the rear of the vehicle with appellant, Agent Kane again asked appellant "if he had any form of paperwork allowing him to transport his load of cigarettes." Appellant replied, "I don't understand, I have cigarettes." When the agents requested permission to look inside his vehicle, appellant responded by nodding his head up and down several times. Appellant stated, "the cigarettes are in the car."

Opening the tailgate of appellant's vehicle, agents found a blanket covering several large black trash bags. Inside the bags were numerous cases of cigarettes bearing Virginia tax stamps. They placed appellant under arrest for transporting and possessing unstamped cigarettes and then transported him to the Maryland State Police barrack in Somerset County. A search of appellant's vehicle uncovered 7,190 packs of various brands of cigarettes.

The statement of facts concluded with the following synopsis of appellant's testimony:

> The defendant would testify that he was traveling through the State of Maryland on his way to another state when he was stopped by the Maryland agents. And his testimony would further be that at no time were the cigarettes intended for use, distribution or sale into or within the State of Maryland.

Before addressing the merits of appellant's claims, a review of the history of the statute at issue, known as the "State Tobacco Tax Act" and now contained in Title 12 and portions of Title 13 of the T.G. Article, provides a helpful context in which to consider his claims.

### The State Tobacco Tax Act

In 1958, the Maryland General Assembly enacted the State Tobacco Tax Act (the "Act"). 1958 Md. Laws ch. 1, § 4. The Act added thirty-four new sections to then Article 81 (Revenue and Tax) of the Maryland Annotated Code of 1957. Md.

Ann.Code (1957, 1958 Supp.), Art. 81, §§ 414–47. The Act, among other things, imposed "a tax to be paid and collected ... on all cigarettes used, possessed or held in the State of Maryland." *Id.* at § 414. To evidence such payment, the Act required that stamps be "affixed by the first vendor or user who [had possessed said cigarettes]...." *Id.* at § 420. Persons found selling or possessing unstamped cigarettes, who did not fall within an enumerated exemption, such as certain "wholesaler[s]" or "consumer[s]," were subject to a fine or imprisonment or both. *Id.* at § 446.

In 1961, the legislature revised the Act and added new sections to it. 1961 Md. Laws ch. 669, § 2. Among the revisions made was that § 446, which had previously both prohibited the possession and sale of unstamped cigarettes and imposed a penalty for violating that prohibition, was divided into two sections: § 438(a), which defined the acts prohibited, and § 463(a), which set forth the penalty for committing those acts. Also, the legislature added language to § 463(a), imposing a penalty: a fine "not more than $1000.00 or imprison[ment] for not more than one year, or both ..." for the "willful[ ]" and "knowing[ ]" possession of unstamped cigarettes.[1] And it enacted § 455, which prohibited, and imposed a penalty for, the transport of unstamped cigarettes without the appropriate invoices or delivery tickets on the roads and highways of Maryland.

In 1988, Article 81 was repealed "in its entirety and substantial portions [including those sections dealing with the Act] were transferred into the concurrently enacted Tax–General Article." *Rossville Vending Mach. Corp. v. Comptroller of Treasury,* 97 Md.App. 305, 313 n. 5, 629 A.2d 1283 (1993)(citing 1988 Md. Laws ch. 2). As a result, Article 81, § 438(a), prohibiting the possession of unstamped cigarettes, became T.G. § 12–305; Article 81, § 463(a), containing the penalty provision for § 438, became T.G. § 13–1014; and Article 81, § 455, which prohibited and imposed a penalty for

1. Md.Code Ann. (1957, Cum.Supp.1965), Art. 81, § 463(a).

the transport of unstamped cigarettes on the roads of Maryland, became T.G. § 13–1015. T.G. § 12–305 provides that, "[u]nless otherwise authorized under this title, a person may not possess, sell, or attempt to sell unstamped cigarettes in the State." [2] Its penalty provision, T.G. § 13–1014(a), provides that "[a] person who willfully possesses, sells, or attempts to sell unstamped ... cigarettes in the State in violation of Title 12 of this article is guilty of a misdemeanor...." [3] And T.G. § 13–1015 provides that "[a] person who willfully ... transports within, this State cigarettes ... on which the tobacco tax has not been paid in violation of Title 12 of this article ... is guilty of a felony...." [4]

## I

We shall first consider appellant's contention that the charge of possessing unstamped cigarettes in violation of T.G. § 12–305(a) is "of no force and effect" because that section "carries no penalty ."

T.G. 12–305(a) provides:

*Possession or sale of unstamped cigarettes.*—Unless otherwise authorized under this title, a person may not possess, sell, or attempt to sell unstamped cigarettes in the State.

■ Because T.G. § 12–305(a) contains no penalty, appellant reasons, "there can be no crime and thus, no conviction." Admittedly, T.G. § 12–305(a) does not contain a penalty for possessing unstamped cigarettes, but T.G. § 13–1014(a) of the same article does. Consequently, the absence of a penalty in T.G. § 12–305(a) does not render that statutory provision a nullity or appellant's actions lawful.

---

**2.** Md.Code Ann. (1988, 1997 Repl.Vol.), § 12–305(a) of the Tax–Gen. Article.

**3.** Md.Code Ann. (1988, 1997 Repl.Vol., 2000 Supp.), § 13–1014(a) of the Tax–Gen. Article.

**4.** *Id.* at § 13–1015.

In support of the proposition that the absence of a penalty in T.G. § 12–305(a) renders it "of no force and effect," appellant cites *United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948). In that case, Evans was accused of concealing and harboring aliens in violation of § 8 of the Immigration Act of 1917, 8 U.S.C. § 144. Specifically, the Act states:

> That any person ... who shall bring into or land in the United States ... [or shall attempt to do so] or shall conceal or harbor, or attempt to conceal or harbor, or assist or abet another to conceal or harbor in any place ... any alien not duly admitted by an immigrant inspector or not lawfully entitled to enter or to reside within the United States under the terms of this Act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $2,000 and by imprisonment for a term not exceeding five years, for each and every alien so landed or brought in or attempted to be landed or brought in.

*Evans,* 333 U.S. at 483–84, 68 S.Ct. 634 (quoting 8 U.S.C. § 144).

Evans moved to dismiss the charges against him, claiming that the indictment "did not charge a punishable offense." *Id.* at 484, 68 S.Ct. 634. "He argued that although the statute provided for two different crimes, one landing or bringing in unauthorized aliens, and the other concealing or harboring such aliens, punishment was prescribed in terms only for the former crime." *Id.* Agreeing with this argument, the United States District Court granted his motion to dismiss. On appeal, the United States Supreme Court concurred, stating:

> The Government in effect concedes that in terms the section prescribes no penalty for concealing or harboring. But it argues that inclusion of them as offenses becomes meaningless unless the penalty provision, in spite of its wording, is construed to apply to them as well as to bringing in or landing. In other words, because Congress intended to authorize punishment, but failed to so, probably as a result of oversight, we should plug the hole in the statute. To do

this would be to go very far indeed, upon the sheer wording of the section.

*Id.* at 487–88, 68 S.Ct. 634.

In contrast to *Evans,* however, the Act expressly imposes a penalty for possession of unstamped cigarettes, but in a different section of the T.G. Article. That section is T.G. § 13–1014(a) and it provides:

(a) *Offense; penalties—In general.*—(1) A person who willfully possesses, sells, or attempts to sell unstamped or improperly stamped cigarettes in the State *in violation of Title 12 of this article* is guilty of a misdemeanor.

(2) If the number of unstamped or improperly stamped cigarettes that a person possesses, sells, or attempts to sell is 30 cartons or less, the person on conviction is subject to a fine not exceeding $500 or imprisonment not exceeding 3 months or both.

(3) If the number of unstamped or improperly stamped cigarettes that a person possesses, sells, or attempts to sell is more than 30 cartons, the person on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year or both.

(Emphasis added.)

The question of whether T.G. § 12–305 should be construed in conjunction with T.G. § 13–1014(a) was resolved by this Court over 30 years ago in *Cornish v. State,* 6 Md.App. 167, 251 A.2d 23 (1969). There, we held that § 438 and § 463 of Article 81, the predecessor provisions of T.G. §§ 12–305 and 13–1014, respectively, were to be so construed. That case provides compelling precedent for us now to do the same with the successor provisions of § 438 and § 463, T.G. §§ 12–305 and 13–1014(a).

In *Cornish,* the defendants were convicted of possessing unstamped cigarettes in violation of § 438 of Article 81, and sentence was imposed pursuant to § 463 of the same article. In affirming those convictions, we stated: "In conjunction with Section 463, Section 438, under which appellants

were convicted, makes it unlawful (with certain enumerated exceptions not here pertinent) to possess untaxed cigarettes in this State." *Cornish,* 6 Md.App. at 171, 251 A.2d 23. Moreover, it "is a general rule of statutory construction that statutes that deal [as the statutory provisions do here] with the same subject matter, share a common purpose, and form part of the same general system are *in pari materia* and must be construed harmoniously in order to give full effect to each enactment." *Murphy v. State,* 100 Md.App. 131, 135, 640 A.2d 230 (1994).

Nonetheless, appellant counters that there is an important difference between T.G. § 13–1014 and its precursor, § 463. Section 463 refers to § 438(a), appellant points out, but T.G. § 13–1014 does not refer to T.G. § 12–305(a). Indeed, § 463 states:

> (a) Any person who shall *wilfully* and *knowingly* sell unstamped or improperly stamped cigarettes upon which tax has been imposed by this subtitle and any person who shall wilfully and knowingly have in his possession any unstamped or improperly stamped cigarettes except as allowed in this subtitle, or any person who shall violate *any other provision of § 438(a)* of this subtitle, shall be guilty of a misdemeanor and upon conviction shall be fined not more than $1000.00 or imprisoned for not more than one year, or both. . . .

Md.Code Ann. (1965 Cumm. Supp.), Article 81, § 463. (Emphasis added.)

In addition, appellant observes that the "new § 13–1014 deleted the word knowingly from former § 463(a) and deleted the broad penalty language in § 463(a) covering 'any other provision of Section 438(a).'" Appellant therefore concludes that in replacing § 463 with T.G. § 13–1014, "the legislature created a statute that criminalizes only the *wilful* possession of unstamped cigarettes and fails to provide a penalty for non-wilful possession of unstamped cigarettes" or, in other words, T.G. § 12–305. We disagree.

Although T.G. § 13–1014 does not refer specifically to T.G. § 12–305(a), it states that it covers "[a] person who willfully

possesses ... unstamped or improperly stamped cigarettes in the State *in violation of Title 12* of this article...." And since T.G. § 12–305 is the only section of that title that prohibits the unlawful possession of unstamped cigarettes, it is clear that T.G. § 13–1014 is intended to cover acts proscribed by that section. The fact that the term "willfully" appears in T.G. § 13–1014 but not in T.G. § 12–305 does not prevent this Court from concluding that term was also intended to apply to T.G. § 12–305, a point similar to the one made by the Supreme Court in *Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), a case we shall discuss at greater length later in this opinion. Briefly, in *Ratzlaf* the defendant was charged with willfully violating an anti-structuring provision of a banking statute. That statute, 31 U.S.C. § 5324 (1994), provided:

No person shall for the purpose of evading the reporting requirements ... with respect to such transaction—... "(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."

The criminal enforcement provision, 31 U.S.C. § 5322, which sets forth the penalties for violating that statute, stated that " '[a] person willfully violating this subchapter [31 U.S.C. § 5311 *et seq.*] or a regulation prescribed under this subchapter ... shall be fined....' " *Ratzlaf*, 510 U.S. at 140, 114 S.Ct. 655 (quoting 31 U.S.C. § 5322(a)).

Although § 5322(a), like the penalty provision at issue, does not mention that a violation of § 5324 must be "willful," the Court nonetheless found that Congress intended to impose criminal penalties only on those who "willfully violat[e]" § 5324. *Ratzlaf*, 510 U.S. at 146–47, 114 S.Ct. 655. It therefore held that to be convicted under that Act it must be shown not only that the accused knew of the "bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report." *Id.*

■ Moreover, the revisor's note to T.G. § 13–1014 states that "[t]his section is new language derived without substantive change from former Art. 81, § 463(a) as it related to a

penalty for possession, sale, or offer to sell unstamped ciga- rettes under § 438(a)."[5] Thus, neither the language of the statutory provisions in question nor their legislative history supports appellant's contention that, in enacting T.G. § 12– 305, the legislature passed an act that has "no force and effect." Furthermore, as a rule, "[w]e presume that the legislature did not set out to create an ineffective or invalid law." *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 114 Md.App. 190, 210, 689 A.2d 645 (1997)(citing *Swarthmore v. Kaestner*, 258 Md. 517, 525–27, 266 A.2d 341 (1970)); *First Nat'l Bank v. Shpritz*, 63 Md.App. 623, 635, 493 A.2d 410, *cert. denied*, 304 Md. 297, 498 A.2d 1184 (1985).

For the same reasons, the lengthy list of state court deci- sions cited by appellant for the same proposition—that a criminal statute without a penalty clause is of "no force and effect"—are not persuasive. *See, e.g., State v. Beyer,* 218 Neb. 33, 352 N.W.2d 168, 171 (1984); *State v. Fair Lawn Service Center, Inc.* 20 N.J. 468, 120 A.2d 233, 235 (1956); *Johnston v. State,* 100 Ala. 32, 14 So. 629 (1894); *Common- wealth v. Cunningham,* 365 Pa. 68, 73 A.2d 705 (1950).

In none of the cases cited by appellant was there a section in the same article providing the purportedly missing penalty as there is here. Moreover, the cases cited by appellant involved either a non-existent penalty or a penalty so ambigu- ous as to defy application. In contrast, T.G. § 13–1014(a) clearly states that "[a] person who willfully possesses, sells, or attempts to sell unstamped or improperly stamped cigarettes in the State *in violation of Title 12 of this article* is guilty of a misdemeanor." We therefore conclude that appellant's con- tention that T.G. § 12–305 is of "no force and effect" because it does not contain a penalty is without merit.

## II

Appellant contends that the evidence adduced at trial was not sufficient to prove that he had "willfully" transported

---

5. Md.Code Ann. (1988), § 13–1014 of the Tax–Gen. Article (Revisor's note).

unstamped cigarettes in violation of T.G. § 13–1015. To be more precise, appellant maintains that the State failed to present sufficient evidence that he acted "willfully," as required by that provision. And, according to appellant, "willfully" in T.G. § 13–1015 means an intentional and deliberate act "in violation of a known legal duty" or, in other words, appellant not only knew what he was doing but he knew it was illegal to do it. T.G. § 13–1015 provides in part:

> A person who willfully ships, imports, sells into or within, or transports within, this State cigarettes or other tobacco products on which the tobacco tax has not been paid in violation of Title 12 of this article or § 16–219 or § 16–222 of the Business Regulation Article is guilty of a felony and, on conviction, is subject to a fine not exceeding $50 for each carton of cigarettes transported or imprisonment not exceeding 2 years or both.

Relying principally on two Supreme Court cases, *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), and *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), and two Maryland decisions, *Reisch v. State,* 107 Md.App. 464, 668 A.2d 970 (1995) and *Attorney Grievance Comm'n v. Boyd,* 333 Md. 298, 635 A.2d 382 (1994), appellant argues that to prove a "willful" violation of the statute in question, it must be shown that "he acted with the deliberate intent to violate a known legal duty." Because the evidence, according to appellant, was insufficient to support such a finding, he claims that his conviction for transporting unstamped cigarettes must be reversed.

In *Ratzlaf,* the issue was whether Ratzlaf had, in violation of 31 U.S.C. § 5322(a) of the Currency and Foreign Transactions Reporting Act (the "Bank Secrecy Act"), "willfully" violated § 5324[6] of that Act by purchasing cashier's checks from

---

6. To deter circumvention of the Bank Secrecy Act, Congress enacted 31 U.S.C. § 5324, as part of the Money Laundering Control Act of 1986, Pub.L. 99–570.

different banks in amounts less than $10,000 to allegedly evade the banks' legal obligation to report cash transactions exceeding $10,000. In *Cheek*, the issue was whether defendant had, under 26 U.S.C.A. §§ 7201 and 7203, "willfully" attempted to evade income taxes and "willfully" failed to file federal income tax returns.

In both *Cheek* and *Ratzlaf*, the Supreme Court did define "willfully" to mean an intentional act in "violation of a known legal duty." As the Court in *Cheek* explained, "[w]illfulness . . . requires the Government to prove that the law imposed a duty on the defendant, *that the defendant knew of this duty,* and that he voluntarily and intentionally violated that duty." *Id.* at 201, 111 S.Ct. 604 (emphasis added). In both cases, however, the Court stressed that it was defining "willfuly" restrictively largely because of the "complexity" of the law at issue—the "proliferation of [tax] statutes and regulations" in *Cheek* and the anti-structuring provisions of the Bank Secrecy Act in *Ratzlaf.* As the Supreme Court explained in *Cheek*, "[t]his special treatment of criminal tax offenses is largely due to the complexity of the tax laws." *Cheek*, 498 U.S. at 200, 111 S.Ct. 604.

In contrast, the sections of the Act at issue here are not "embedded" in a "complex of provisions" as the relevant statutory sections of the Bank Secrecy Act were in *Ratzlaf.* Nor did appellant face, as the defendant in *Cheek* did, a "proliferation of statutes and regulations" that, as the *Cheek* court observed, "has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws." *Id.* at 199–200, 111 S.Ct. 604. Quite the contrary, the prohibition against possessing and transporting unstamped cigarettes in the T.G. Article is quite clear. The language is unambiguous, and, apart from the fact that the penalty provision is in a separate section of the Article, a common feature of statutory construction,[7] and

---

7. *See State v. Kalian,* 122 R.I. 443, 408 A.2d 610, 611 (1979) (holding there "is no necessity that the penalty be included within the same proviso" as the criminal statute); *McNary v. State,* 128 Ohio St. 497,

the term "willfully" does not appear in T.G. § 12–305, there are few, if any, impediments to knowing what the law requires.

Furthermore, in *Ratzlaf,* the Court also

"count[ed] it significant that the omnibus 'willfulness' requirement of § 5322(a), when applied to other provisions in the same subchapter, consistently has been read by the Courts of Appeals to require both 'knowledge of the reporting requirement' *and* a 'specific intent to commit the crime,' *i.e.,* 'a purpose to disobey the law.' "

*Ratzlaf,* 510 U.S. at 141, 114 S.Ct. 655 (citations omitted). That factor is not only missing in this case, but, as the Court of Appeals has recently pointed out, interpreting "willfully" to mean "intentionally," as opposed to "inadvertent[ly]," is consistent with how that term has been interpreted in the context of other Maryland statutes. *Deibler v. State,* 365 Md. 185, 195, 776 A.2d 657 (2001) (holding that willfulness as it pertains to the Maryland Wiretapping Law does not "require knowledge on the part of the defendant that his or her action is unlawful—that is prohibited by the statute").

We now turn to the to Maryland cases upon which appellant relies for the proposition that "willful" must be interpreted in the context of the Act to mean appellant "acted with deliberate intent to violate a known legal duty." They are: *Reisch v. State,* 107 Md.App. 464, 668 A.2d 970 (1995) and *Attorney Grievance Comm'n v. Boyd,* 333 Md. 298, 635 A.2d 382 (1994).

In *Reisch,* the defendant was convicted of "knowingly and willfully" performing home improvement work without a home improvement license in violation of Article 56, §§ 255 and 261 of the Annotated Code of Maryland. The defendant was hired by a homeowner to remove paint from his house. In the course of removing the paint, the defendant "performed work encompassed by the home improvement laws and was not

191 N.E. 733, 739 (1934)("To our knowledge no one has ever insisted that the penalty should be included in the same section of the statute that defines the crime.").

licensed" to do so. *Id.* at 471, 668 A.2d 970. Although conceding that he did not have a home improvement license when he performed the work in question, the defendant "insisted that he 'was properly licensed for everything,' because he had complied with DOE requirements and was properly certified as a lead abatement contractor, in accordance with the Code of Maryland Regulations (COMAR)." *Id.* at 470, 668 A.2d 970. Furthermore, it was "undisputed that the primary purpose for which [defendant] was hired was lead paint abatement and most of the work that he performed was related to lead abatement." *Id.* at 471, 668 A.2d 970. After a thorough review of Maryland caselaw regarding the meaning of "willfully," this Court, adopting the definition of willfulness requiring an intentional violation of a known legal duty, "conclud[ed] that the State's evidence was legally insufficient to prove that [the defendant] acted wilfully." *Id.* at 483, 668 A.2d 970. In reaching that result, we relied upon, among other authorities, our earlier holding in *Fearnow v. Chesapeake and Potomac Telephone Co.,* 104 Md.App. 1, 655 A.2d 1 (1995), *aff'd in part, rev'd in part on other grounds,* 342 Md. 363, 676 A.2d 65 (1996). In that case, we held that the "term 'willfully' means 'more than intentional or voluntary.' It denotes either an intentional violation or a reckless disregard of a known legal duty." *Id.* at 23, 655 A.2d 1. *Fearnow,* however, has been overruled by the Court of Appeals in *Deibler* on precisely that issue.

Moreover, the instant case is distinguishable from *Reisch* on two grounds: First, as in *Ratzlaf* and *Cheek,* but in contrast to the instant case, the defendant in *Reisch* was faced with a confusing array of statutes and regulations. As this Court observed in *Reisch,* "neither the COMAR provisions pertaining to lead abatement . . ., nor the Home Improvement Laws contained in art. 56, make any reference to each other." *Reisch,* 107 Md.App. at 484, 668 A.2d 970. Complicating matters further, we noted in *Reisch* that "there is ample language in COMAR indicating that, with the possible exception of work on the glass and the repair of the concrete, virtually all of the work [the defendant contractor] performed

was at least *related* to lead abatement." *Id.* at 484, 668 A.2d 970. And second, the line between lawful lead abatement activity and unlawful home improvement activity was so slender as to make it difficult for the unwary contractor to be sure where one began and the other ended. Indeed, the *Reisch* court noted that the concrete repairs made by the defendant, which ostensibly constituted home improvement work, could be justified as part of an effort "to seal lead contaminated soil...." We therefore conclude that the reasons for giving "willful" a restrictive interpretation in *Reisch* are absent from the case *sub judice.*

Appellant also cites *Attorney Grievance Comm'n v. Boyd,* 333 Md. 298, 635 A.2d 382 (1994), for the proposition that "willful" refers to an act done "with the deliberate intent to violate a known legal duty." In that case, the Court of Appeals did hold that "willfulness may be established merely by proving a voluntary, intentional violation of a known legal duty." *Id.* at 309, 635 A.2d 382. But in the context of that case, the Court of Appeals used the phrase "known legal duty" to mean a commonly known duty, not necessarily personal knowledge of such a duty as the Supreme Court used that term in *Cheek* and *Ratzlaf.*

*Boyd* involved a disciplinary proceeding in which a Maryland attorney was charged by the Attorney Grievance Commission with multiple violations of the Rules of Professional Conduct. Among other things, Boyd was charged with violating state and federal tax laws by failing to remit the taxes withheld from the paychecks of one of his former secretaries and by failing to pay the unemployment taxes of another. Following a hearing on those charges, the circuit court found that Boyd had violated a number of the Rules and characterized his conduct as a "willful disregard for the law and the Rules of Professional Conduct." 333 Md. at 322, 635 A.2d 382. Affirming the circuit court's decision, the Court of Appeals stated:

> In this case, the testimony shows that respondent knew the quarterly tax forms were mailed to his office and had to be filed, and knew that his secretary could not complete

them. Respondent admitted that the withholding taxes were never remitted to the Internal Revenue Service or the Maryland Comptroller of the Treasury, and that unemployment taxes for Sandra Yeadon were not paid until she filed for unemployment benefits and was denied. Because the duty of an employer to file withholding returns and pay withheld taxes is a known legal duty, these facts ... support the hearing judge's conclusion that respondent's failures were willful.

*Id.* at 309, 635 A.2d 382. (Emphasis added.)

Thus, the Court of Appeals held in *Boyd* that willfulness does not require that the defendant actually knew of the legal duty but only that he violated a duty that was well known. It is unclear, however, whether the Court was suggesting that personal knowledge could be inferred from that fact or was creating a "should have known" standard for willfulness in cases such as *Boyd.* In any event, its applicability to the instant case is in doubt, given the Court's recent decision in *Deibler v. State,* 365 Md. 185, 776 A.2d 657 (2001), to which we now turn.

The *Deibler* decision begins with a delightful recapitulation of the story of Lady Godiva in which we learn that she was history's most underclad tax protestor and not, as some of us assumed, the inventor of pricey chocolate. The Court then addressed the meaning of "willful" in the context of the Maryland Wiretap Law. In that case, Deibler was accused of placing a video camera in the bathroom of a friend's home in violation of § 10–402(a)(1) of that law. That provision "makes it unlawful for any person to '[w]illfully intercept ... any wire, oral, or electronic communication.'" *Id.* at 191–92, 776 A.2d 657 (citing § 10–402(a)(1)).

After an exhaustive review of the legislative history of the federal wiretap law, upon which the Maryland Wiretap Law was modeled, the Court observed "that Congress did *not* intend that the word 'willfully,' as used in [the federal wiretap act], to have such a restrictive meaning—to require that the person intercepting a communication know that his or her

conduct was unlawful.....'' *Id.* at 197, 776 A.2d 657. Not content to rest its ruling on just that ground, the Court turned to Maryland law. After noting that "willful" has been defined "for the most part" in other "Maryland criminal statutes" to mean "purposeful conduct, requiring neither a bad motive nor knowing unlawfulness," the Court observed that "[i]t is a sensible and appropriate definition." *Id.* at 199, 776 A.2d 657. It thereupon concluded that for purposes of the Maryland Wiretap Law "an interception that is not otherwise specifically authorized is done willfully if it is done intentionally—purposely." *Id.* "That," the Court cautioned, only "excludes interceptions arising from inadvertence or simple negligence, which may occur in a variety of ways." *Id.* Consequently, we believe that the Court's definition of "willful" in *Deibler* is applicable to the case *sub judice.*

In any event, no matter what definition of willful is employed, there was sufficient evidence for the circuit court to conclude that appellant had willfully possessed and transported unstamped cigarettes into Maryland and that he did so in violation of a known legal duty. Appellant's knowledge of that duty can be inferred from the extraordinarily large quantity of cigarettes he purchased, far more than was necessary for personal use; the fact that, at the Peace Token store, he parked his car at a location known to be used by those involved in the illegal importation of cigarettes into Maryland; that he spread his purchases among several different stores; and that he later covered the unstamped cigarettes with a blanket before entering Maryland. In short, the record below supports the circuit court's finding that Mr. Chen willfully transported unstamped cigarettes within the State of Maryland in violation of T.G. § 13–1015, no matter which definition of willful the circuit court employed.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**